## UNCONSTITUTIONAL FEATURES IN THE AMENDED MUNICIPAL UNIVERSITY STATUTES.

[Circuit Court of Lucas County.]

THE STATE OF OHIO, ON RELATION OF ALFRED M. WALDRON v. THE CITY OF TOLEDO, RANDALL G. BACON, AS AUDITOR OF THE CITY OF TOLEDO, AND HENRY M. BARFIELD, AS TREASURER OF THE CITY OF TOLEDO.

Decided, October 10, 1904.

*Constitutional Law—Schools and Universities—Legislature Without Power—To Change Control of Schools—Founded by Private Donors—Definition of "University"—Boards of Education—Mandamus.*

1. Section 4105, Revised Statutes, as amended April 25, 1904, is invalid in so far as it attempts to transfer, from the board in which previously lodged to the board of education, the management and administration of any and all estates or funds given in trust to any municipality for the promotion of education.

2. The definition of a "university" given in the latter part of Section 4102, as amended, can have no bearing on the question of control of a school established by a private donor to carry out his purposes in regard to education, and endowed by his property and the property of others given for the same purpose. The denominating of such a school as a "university" does not deprive it of the protection of the Constitution of the state and the guaranty that all private property shall ever be held inviolate, notwithstanding it has not yet attained to the full scope of a university.

HAYNES, J.; PARKER, J., and HULL, J., concur.

A petition was filed, asking that a writ of mandamus issue against these defendants, commanding said defendant, Randall G. Bacon, as auditor of said city of Toledo, and his successors in office, to issue and sign a warrant upon the treasurer of said city in favor of relator for the sum of $65, and commanding said Henry M. Barfield, as treasurer of said city, and his successors in office, to pay the amount of said warrant to relator, the same being for services performed by relator as an engineer, he having been employed by the trustees of "The Toledo University," so called. The action is against these officers, claiming that they have failed to perform their duties in not

issuing a warrant and paying him for his services, and averring that there are funds existing in their hands properly applicable to the payment of said amount, as he claims.

The real answer in the case is, that the persons who were the board of trustees at the time he was hired, and at the time that these services were performed, no longer existed as a board of trustees, by reason of a certain act of the Legislature which took effect on the day of its passage; and, as it was passed prior to the time of the performance of these services, that these officers ceased to have any power or authority in the premises.    The officers that are spoken of were officers who had been appointed as trustees of what was known as the Toledo University of Arts and Trades, a corporate body that had been organized at the instance of the late Jesup W. Scott, and for the purpose of carrying out certain benefactions which he was intending to give, for the purpose of carrying out and effecting the establishment of this Toledo University which he proposed to establish and for which he gave funds.

The board, or rather the university, has been leading a rather strenuous life.    I believe this is the fourth time it has been before us in one form or another.    Its existence has been attacked, and its methods of carrying on business has also been attacked.

The question here is one that we shall pass upon very briefly. In the case of *State, ex rel,* v. *Toledo,* 3 C. C.—N. S., 468, after full argument of the question, we delivered an opinion in which we set forth the history of this institution, with a very full discussion of the condition of it at that time, and in which we held that it had a legal existence, and that the board of trustees that were then appointed to conduct its affairs had a lawful right to continue to do so.

Subsequently, in *State, ex rel Rohr,* v. *Adam Schauss et al,* 3 C. C.—N. S., 388, there is a very lengthy discussion of the powers and duties of the board, and a judgment affirming the action of the board in certain matters.

On the 28th of May, last, in the case of *James Waddick, a tax-payer, et al* v. *John B. Merrill et al,* 5 C. C.—N. S., 103, the matter was argued again in regard to this board, and an opinion

was delivered in regard to the construction of the word "university" and the powers and duties of the board.

I do not propose to go over again the ground that has been traveled by these cases, or the points made by them. Reference may be had to those for the views of this court, and with the views there expressed, we are still satisfied to abide by them as matters that have been adjudicated so far as this court is concerned. Suffice it to say, that the board of trustees of this institution up to the time of the passage of this act of the Legislature was, so far as this court is concerned, a lawful body, and was conducting the affairs of the board in a lawful and proper manner, and that within the definition of the statutes and the definition of the acts of the corporation it was a university.

The party who brought this action has brought it in the form of a mandamus. Really it seems to us that if the city intended to attack the lawful authority and existence of that board, the better way to have brought it would have been quo warranto. Still, perhaps it is sufficient to aver and perhaps they may aver that the body has ceased to exist, and that therefore so far as its office is concerned, that anything they have done is without authority of law and beyond their powers, and is not obligatory upon any officer of the city or any person having funds of the board in charge.

This controversy arises under a statute passed in April, 1904, It is sufficient to say that under prior statutes, by the action of the board, the property of the university had all been transferred to the city of Toledo, and that property remains still in the city of Toledo, as its property, and it took it and made arrangements to carry out the purposes of the original act of incorporation, according to the original views of the donor who established the school.

Prior schools or universities similar to this have been established in Cincinnati, and certain powers in regard to them have been transferred to the city of Cincinnati, and the city of Cincinnati is aiding and carrying on and supporting those schools. In a case that is found in the 65 U. S., at page 465, the whole question of the power of the city of Cincinnati to

receive and accept any care or control of these schools or universities that have been established, was brought in question, and was decided by the Supreme Court of the United States, and that decision is referred to at length in a case to be found in The Ohio Circuit Decisions, of *State* v. *Toledo, supra.* The subsequent act had made the original acts in regard to such matters extended—it extended them to the city of Toledo—and the city of Toledo has received this property and is carrying on this trust.

Now, Section 4102 of this statute is found on page 544 of Volume 97, Ohio Laws, and Section 4105 is found on page 545 of the same volume. Under these sections certain powers have been given to a certain body and certain definitions made by the Legislature, and it is claimed that under and by virtue of these acts—this definition of this grant of power—the authority was taken away from these trustees, and they were deprived of all authority in regard to the administration of this fund or of any powers in fact in regard to the university so called.

The latter part of this Section 4102 provides or enacts:

"A university supported in whole or in part by municipal taxation, is hereby defined as an assemblage of colleges united under one organization or management, affording instruction in the arts, sciences and the learned professions, and conferring degrees."

Section 4105 provides:

"The custody, management and administration of any and all estates or funds, given or transferred in trust to any municipality for the promotion of education, and accepted by the council thereof, and any institution for the promotion of education heretofore or hereafter so founded other than a university as defined by this act, shall be committed to and exercised by the board of education of the school district including such municipality, and such board of education shall be held the representative and trustee of such municipality in the management and control of such estates and funds so held in trust and in the administration of such institution, excepting always such funds and estates held by a municipality which are used to maintain a university as defined by this act."

It is claimed that this university of arts and trades came within the definition that is laid down by the statute in this case, and that therefore the control and management of its funds had passed and did pass on the day the act was passed, which was April 25, 1904, to the board of education of the city of Toledo, the school district through which the board of education has control, being composed in part of the city of Toledo.

Now this institution, when it was founded by Mr. Scott, was called a university; Mr. Scott was a man of rather large views; he looked into the future rather more than he did into the present. He lived in Toledo when it was a very small village, and yet he saw the possibilities of a very large city; and he lived to see the commencement of it, but he did not live to see the fulfillment of it; but he builded according to his conceptions of the future. He laid out and planned for the university. He gave to it property at that time which he valued at $80,000 and made provisions for the carrying out of a school that should embody his ideas of a certain class of education that should be given or furnished the youths of this city, or county, or neighborhood. It was small in its inception. He expected there would be future donations. It received at the time that he formed this school some $15,000 in money from Mr. William H. Raymond, which went into the fund and has been in ever since. Certain other parties have made donations to the fund—not to a very large extent—but they still are donations and remain the property that is embodied in this scheme, this school or university. It was small in its beginning, but I assume Mr. Scott did not expect or could not reasonably expect it would grow to large proportions in a day or in a year, but as the city grew and as its means multiplied, he did expect that donations would be made to the school, and that the school would thrive and flourish as a university. Primarily it was given to help the arts and trades. Schools were designed for things of that kind; still provisions were made for branching out in other departments. It looked to some extent evidently from the terms of his grant or deed to the incorporation, which he drew and gave to the

city, he expected that the university he established would furnish the means for scholars taking a course after they had graduated from the schools of the city, and that they would work to a certain extent in co-operation in carrying out the purposes of this trust. I should say here, that although this was a school that had not large means, still it is entitled to the same protection of the law as though it had an endowment of millions.

Now the board of education was elected, in pursuance of the statutes of the state, under a distinct department of the government of the state, recognized as such in the Constitution of the state of Ohio, and this department is known as the common school system in the state of Ohio, being adapted to townships, to school districts, to cities, and to larger districts, but the same objects and purposes being carried out, and that is to educate the people and the children of the state, in the common schools of the state, and to that extent a large fund was provided by the state of Ohio, the money was loaned by the state of Ohio, and the interest from it, it has been so provided, was to be for the perpetuity, for the protection and promotion of the schools.

But there is now and always has been universities that are provided for higher degrees of education, for different degrees of education and education for different purposes, as the wants of the people or a portion of the people may seem to need; and they are endowed and possess funds that are held for the purpose of sustaining schools and universities.

Now, in regard to this case there has been quite a number of points made by counsel for the plaintiff and authorities cited in quite a large abundance, and arguments have been made on behalf of the city, and some citation of authority made by them. In regard to this point, in deciding it, I shall be very brief, and I shall not attempt to go over these various points that have been argued by counsel, simply because I do not think it is necessary in the present case. The simple question is whether this board had authority to create a debt in favor of Mr. Waldron.

We think this case has been decided in the state of Ohio in principle, by the Supreme Court of this state, and the cases that were cited by that court, and the great body of cases that may be cited in other states, and the Supreme Court of the United States, to say nothing of those general principles of law which have been maintained in England in regard to this same class of schools, or charities, as they are sometimes called. In the case that I have referred to, *State* v. *Toledo,* is cited what is known as the Dartmouth College case, and the principles which have been laid down by the Supreme Court of the United States. I shall not refer to those cases.

Now this case, which is denominated *Ohio, ex rel,* v. *Neff et al,* decided on March 12, 1895, by the Supreme Court, is found in 52 Ohio State Reports, at page 375. The facts, of course, are not just the same as they are in this case, but the principles which are announced and which underlie the dicision are the same, because in their very nature, they may be said to be eternal in regard to this class of institutions. In that case there was a school in Cincinnati, called Cincinnati College. It was established at an early day and ran rather a varied course. It was intended that there should be no limitation as to what might be taught, and they started with several matters, as I understand. They tried medicine and they tried other matters, and finally they tried law; and they established a law school which was under Mr. Timothy Walker's direction in his day, and it came to be a very large school, and it has continued to be so until recent times, and a very large number of lawyers in Ohio were educated in that school. That was a success. It was supported and maintained. I speak from history and not from the report. Some people had become dissatisfied with the manner in which the school had been conducted, and thought they ought to have some different teachers and some different methods of teaching. Some people were taught in other colleges and they thought the system that was taught in the college they were in was adapted to better purposes than the instruction in the law school, and finally they established another school. Perhaps the university or Cincinnati school had been established some little time before. When the time

came around, they sought to get control of the law school, and they caused an act to be passed, and an act was passed by the General Assembly of the state of Ohio, that amended Sections 3, 4 and 5 of the act incorporating Cincinnati College, passed January 22, 1819, and it provided:

"Sec. 3. The affairs of the said Cincinnati College shall hereafter be under the management of the directors, for the time being, of the University of Cincinnati, which directors shall be, and they are hereby constituted the board of trustees of the Cincinnati College, and they are hereby authorized to exercise all the powers granted by law to the board of trustees of the Cincinnati College.

"Sec. 4. Be it further enacted, that the management of the funds, and of other matters belonging to or connected with the said Cincinnati College, shall be solely in the hands of the board of trustees aforesaid, and the said funds shall be administered for the purpose of carrying out the objects of the charter of the Cincinnati College, in connection with the funds and administration of the University of Cincinnati.

"Sec. 5. The board of trustees shall appoint a treasurer, who shall give bond and security for the faithful performance of his duty; they may elect a president and vice-president of the college and appoint such tutors and professors they shall think necessary; which president and vice-president, professors and tutors may be removed at the pleasure of the board; they may, from time to time, make and enforce such rules, regulations and by-laws for the government and well-being of the college, as may seem to them proper; *provided, they be consistent with the laws of the United States,* and this state; they may appoint a faculty to consist of the president, vice-president, professors and such other persons as they may judge necessary and vest in the faculty so appointed such powers as they may think expedient for the preservation of good order, and for enforcing obedience to the rules, regulations and by-laws of the institution; they may cause the principles of morality and of the Christian religion to be included, but the religious tenets that may be peculiar to any particular sect or denomination, shall never be taught or be enforced in the college."

Then it provides for holding their meetings, and it has a proviso:

"That the funds of the institution shall not be applied to any use, or for any purpose, not herein expressed or intended."

And they repeal the act incorporating Cincinnati College, and they provide that that act shall be in force and take effect from and after its passage.

In· deciding these matters, Judge Bradbury, in giving the opinion of the court, proceeds to state the views of that court in regard to the case, and it seems entirely proper that I should read that decision, although it is a little long; but it states the law which governs this case. Judge Bradbury says:

"The constitutionality of this statute is assailed on a number of grounds, one of which is that it violates that provision of the nineteenth section of Article I of the Constitution of Ohio, which asserts that 'private property shall ever be held inviolate.' Whether the statute is obnoxious to that constitutional provision depends (1) whether it violates the property rights of the Cincinnati College, and (2) if it does so, whether that corporation is entitled to the protection secured by the clause of the Constitution of this state above quoted.

"No refined process of reasoning or unusual keenness of perception is required to ascertain the effect of this statute upon the property rights of the Cincinnati College. It simply, and in unambiguous terms, abrogates these rights by transferring them to a body of strangers. No language that the court might use can make this result more clear than does the concise language employed by the General Assembly. The expressly declared reason for this legislative action is the assumed insufficiency of the property of the Cincinnati College, as managed by the present directory, to 'carry out the purposes of its charter,' and assuming further, that 'it would be advantageous to the Cincinnati College and to the University of Cincinnati, and the public generally, that the government of the two institutions should be joined and consolidated,' it seizes the entire property of the one and hands it over to the other of the two bodies. It is no answer to this to assert that the new directory represents the old corporation, or that the legal title to the property still remains in the Cincinnati College. The mere naked legal title to the property has no value, when that title is absolutely severed from its control and beneficial enjoyment. It is the province and the duty of courts to look at the substance of the transaction, and to ignore refined and unsubstantial distinctions. And we can see no substantial difference

between a statute which expressly creates a new corporation and endows it with the property of another body corporate, and a statute like the one under consideration, which, finding the corporation already existing, vests in the directory of the latter all the powers and rights of property which had belonged to another corporate body. And whether we regard the corporation as the actual and potential proprietor of the property in contention, or whether we consider those who contributed to or created this fund or property as such proprietors, and the corporation a mere agency, created to represent them and carry their will into execution, is immaterial in this connection. For, if the corporation is the real owner, it has been deprived of its use and enjoyment of its property, while if those who originally created the fund are the real owners, then without their consent and against their will, it has been taken from their chosen agents, and placed in the custody and management of others, whom they did not appoint and over whom they have no control. Property in the hands of an agent is just as inviolate as that in the custody of the owner himself. As long as the principal may choose and control his agent, his dominion of the property confided to the agent continues, but this dominion, or proprietorship, is at once destroyed the moment that his property is forcibly, and against his will, seized, and absolutely and irrevocably transferred to another agent, selected not by the owner, but by some other person or authority.

"We have seen that the statute under consideration has taken from the control and management of the Cincinnati College all of its property and placed it under the control and management of the University of Cincinnati. One ground, we understand the argument of counsel, upon which this result is maintained to be lawful, is that the purpose to which this property was devoted by its original donors is a public purpose, and, therefore, that circumstance alone is sufficient to impress upon the property a public character; but if that is not so, yet as the purpose of the donors was not private gain, but public charity, and as the property under the new corporation would be applied to the same purpose to which the Cincinnati College would have applied it, had the latter continued its administration, that therefore no substantial right, either of the original donors or of the corporation, was violated by the law. That in fact the only rights the original donors had, as the result of their contribution to the funds of the Cincinnati College was that of voting for directors of the concern, which was 'no more property than the privilege and duty of a citizen to vote for a governor of state, or presidential electors, are are property.'

"The results of establishing this doctrine would be to place every eleemosynary corporation within the state, whether religious, educational, or created to administer to the wants of the suffering or needy, beyond the limits of constitutional protection. Whenever, in the opinion of a majority of the General Assembly, the public interest, or the interest of two or more colleges, or churches, or other private or eleemosynary corporations, required them to be united, the property of one or more of them could be seized and transferred to another. The doctrine finds no support in any treatise or adjudication within our knowledge, nor by reason or justice. There are two classes of public charities, one where the institutions are public in the broadest sense of that term; that is, they are owned by the state, or some subdivision thereof created for governmental purposes, and maintained at the public expense. These institutions are absolutely under the control and management of the public through its proper representatives. As respects them no vested or private rights pertain. It does not follow, however, that because this class of public charitable institutions are the subject of absolute public control, that another class, whose property consists of private donations, and to which the organized public has contributed nothing, shall also be subjected to such absolute governmental control, because the charity they administer has been christened a 'public charity' in legal nomenclature. In common acceptation, colleges are not 'charitable institutions,' although in law they administer a public charity. This means no more than that the public are incidentally benefited by the education of some of its members, the immediate advantage accruing to the individual members who have received the instruction.

"The unbroken current of authority declares that the property of such institutions is private property, and the corporations themselves private corporations. *Dartmouth College* v. *Woodward*, 4 Wheaton, 518; *Vincennes University* v. *Indiana*, 14 Howard (U. S.), 269; *Inhabitants of Yarmouth* v. *Inhabitants of North Yarmouth et al*, 34 Me., 411; *Trustee* v. *Salamond*, 11 Me., 114; *Trustees* v. *Foy*, 1 Murph. (N. C.), 58; *State, ex rel Pittman et al*, v. *Adams et al*, 44 Mo., 570; *Downing et al* v. *The Indiana State Board of Agriculture*, 129 Ind., 443; *Board of Education* v. *Greenbaum*, 39 Ill., 609; *Board of Education* v. *Bakewell*, 122 Ill., 339; *Montpelier Academy Trustees* v. *George et al*, 14 Louisiana, 395.

"When the donors of property devote it to a charitable purpose and choose an existing, or create a new corporation as an instrument by which this purpose is to be effected, they make

this instrument their perpetual representative for that purpose. 'These gifts were made, not indeed to make a profit for the donors or their posterity, but for something in their opinion of inestimable value; for something which they deem a full equivalent for the money with which it was purchased. The consideration for which they stipulated is the perpetual application of the fund to its object in the mode prescribed by themselves. Their descendants may take no interest in the preservation of this consideration. But in this respect their descendants are not their representatives. They are represented by the corporation. The corporation is the assignee of their rights, stands in their place, and distributes their bounty, as they would themselves have distributed it, had they been immortal.' *Dartmouth College* v. *Woodward,* 4 Wheaton, 642.

"Whether the Cincinnati College is regarded as the owner in its own right of the property donated to it, or as the representative of the donors, charged with the execution of their purpose, is not material; in either view the property is private as contradistinguished from public, and as such is within the protection of that provision of the Constitution, which declares private property to be inviolate.

"We now come to the consideration of the provision in the charter of the Cincinnati College, which reserves to the General Assembly the right of amendment. This reservation would be wholly unnecessary if the Cincinnati College had no rights of property, which the General Assembly was bound to respect. If the Legislature, at its will, could divest this corporation of its property, the legislative control of the institution would be absolute, for by taking away its entire property rights, all effectual corporate action would be at once paralyzed. Thence forward it would be powerless to advance the purposes of its creation.

"The authorities agree in holding that the legislative power of amendment and alteration thus reserved in charters, is not absolute, although its boundaries are not yet established. In Kentucky this power of amendment seems to be limited to those matters which concern the relations established by the charter between the corporation and the state.

"'The power to alter or amend the contract, in our conception, is to change it *as between the original parties and such others only as have been permitted, by their mutual consent, to come into the enjoyment of its benefits and privileges;* not to compel one of the parties to operate in conjunction with the others, and share with them the privileges and benefits of the contract.' *Sage* v. *Dillard,* 15 B. Monroe, 359.

"Whatever difficulties have been encountered by the courts in ascertaining the limits of this reserved legislative power, they concur in denying that under it the Legislature can strip a corporation of its rights of property.

" 'The power of alteration and amendment is not without limit. The alterations must be reasonable; they must be in good faith, and be consistent with the scope and object of the act of incorporation. Sheer oppression and wrong can not be inflicted under the guise of amendment or alteration. Beyond the sphere of reserved powers, *the vested rights of property of corporations in such cases are surrounded by the same sanctions and are as inviolable as in other cases.' Shield* v. *Ohio*, 95 U. S., 324; *Detroit* v. *Plank Road Co.*, 43 Mich., 140; *Orr* v. *Bracken Co.*, 81 Ky. Rep., 593.

"The Cincinnati College was the lawful owner of the property in its possession; it is immaterial whether it was acquired from the Cincinnati Lancaster Seminary that it succeeded, or by subscriptions and donations subsequently made. This property had been intrusted to it for the purposes of establishing and maintaining a 'college,' no specific branches of learning were prescribed, or nethod of instruction commanded. Primary, academical, medical, legal and philosophical courses were from time to time attempted; all of them except the law school proved unsuccessful and were abandoned; the latter has been continuously and successfully maintained for nearly sixty years, and substantially the entire income of the institution during that period has been devoted to its maintenance and improvement, without material objection appearing to have been made by any one of the donors. The facts that such donors of the property to this institution gave it with knowledge that no specific branches of learning or method of instruction were prescribed by its charter, together with a brief history of its various educational attempts and failures just averted to, and the acquiescence of such donors therein, tend to show that these donors entrusted to this chosen instrument of their will a wide discretion respecting the course and method of instruction, to which their donations were to be devoted, and if good faith is to be kept with these donors, we must deny to the Legislature the power to seize the fund this raised, and transfer it from these chosen agents to others, in whose discretion they did not confide. This power we think is prohibited by Section 19 of Article I of the Constitution of 1852, which declares the inviolability of private property."

In that case the Supreme Court declared the law unconstitutional.

It appears in evidence that the original property that was donated by Mr. Scott, and by others with him, still remains as the property of this institution. It is true that the control of it was transferred to the city of Toledo, and is in their hands subject to the donor's trust, accepted as such, and is subject to this trust as we have already held. It will be seen that this statute seeks to take from the trustees appointed by the mayor of the city of Toledo, the control of this property and pass it over to another board, to-wit, the board of education. We are clear in our views that the Legislature had no authority whatever to authorize this. They had no right to take this property, to control this property, or this school, in any manner or form, from these trustees, and pass it to the board of education. As to them, that board of education is a foreign board and separate and distinct, and they might as well have passed it to some other board—the county commissioners—or any set of men that they had seen fit, as to have passed it to the board of education. The board of education, it has been held in this state, is not a corporation. It consists of certain trustees. It simply takes those trustees, and in the language of the statute, makes them the representatives of the city of Toledo. They have done exactly what was done in this case of Cincinnati College. They put the trustees of the board of education in place of the trustees of this board, and they say that they shall vote for and shall carry out the management and control of this institution.

We do not think it is necessary to pass upon the definition of the word "university." I do not think that has any bearing whatever on this present case. The school was started as a university. It was intended to be such in the future. It was intended to have different departments, but back of that it was a school established by a private donor to carry out his purposes and his views in regard to education, and was endowed by his property, and by the property of others who donated it with him, and that property, whether you call it a "university" or a polytechnic school, is a corporation that owns property, and is to be protected by the Constitution of the

state of Ohio, which declares that private property shall ever be held inviolate. If this incorporation had one million dollars, it would not make any difference in the principles involved. A mandamus will be awarded in this case.

PARKER, J.

I want to say, with respect to the board of education being an entirely distinct body and the school district being entirely distinct from the municipality under the statute, the fact that the governing body of the former is called the "Board of Education of the City of Toledo" may tend to created confusion; but when we come to think of it, though the limits of the school districts may be coterminous with those of the corporation, it appears that in this case they are not precisely so, and the law does not require that they shall be so; and the fact that they may, in a given case, be exactly coterminus would not change the legal status of the two bodies. They are created by the law to perform entirely different functions from those performed by the city government. They represent a different electorate; not only may they be chosen by people some of whom reside outside the city limits, but within the city limits the electorate is not the same, for now, under the law, women are authorized to vote for members of the board of education. They are officers, in the choice of whom, the city as such, has no voice whatever, either directly or indirectly. It may be expedient, it may be wise to put this school under the management of the board of education; but we are all of the opinion that it can not be legally done in the way it is here attempted. If these statutes were put in form, so that the city, through some board or officer, or through its electors, might voluntarily choose the board of education to manage this school, for my part, I am not prepared to say that that would not be entirely legal or regular; but we are clear that where the Legislature undertakes to do it so as to directly deprive the city of all voice in the matter, the attempt must fail for the reasons stated by Judge Haynes.

*I. N. Huntsberger*, for plaintiff.

*U. G. Denman* and *C. K. Friedman*, for defendants.